Filed 7/2/13  P. v. Gray CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>    v.<br><br>DARRELL MARTIN GRAY,<br><br>  Defendant and Appellant. | G045645<br><br>(Super. Ct. No. 06NF2588)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, David A. Thompson, Judge.  Affirmed.

Michael Clough, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Lilia E. Garcia and Stacy A. Tyler, Deputy Attorneys General, for Plaintiff and Respondent.

Darrell Martin Gray appeals from a judgment after a jury convicted him of special circumstances first degree murder, shooting at an occupied motor vehicle, conspiracy to commit murder, three counts of premeditated and deliberate attempted murder, and street terrorism, and found true he committed the offenses for the benefit of a criminal street gang, and he was a gang member who vicariously discharged a firearm and caused great bodily injury. Gray argues his defense counsel, who has since been disbarred, was ineffective and the prosecutor committed multiple instances of misconduct. In our prior nonpublished opinion, *People v. Gray* (Feb. 25, 2013, G045645) (*Gray I*), we concluded Gray's trial counsel was inadequate and the prosecutor committed one instance of misconduct, but we also concluded Gray was not prejudiced.

Gray filed a motion to augment the record and a petition for rehearing. In his rehearing petition, Gray argued, among other things, we erred in relying on a transcript of Gray's pretrial admissions to investigators because the transcript Gray's appellate counsel introduced into evidence at the new trial hearing did not accurately reflect Gray's video recorded statements. The video, however, was never introduced into evidence or marked as an exhibit, and therefore, is not part of the record on appeal. Consequently, we denied his motion to augment the record but granted the rehearing petition and stayed the appeal to allow Gray time to file a petition for writ of habeas corpus. Gray filed a request for judicial notice, which we also denied. Gray filed a request for habeas corpus investigation fees. Instead of ruling on that motion, we ordered the parties to brief the issue of whether Gray's appellate counsel, the same counsel who represented Gray during the motion for new trial proceedings, has a disqualifying conflict of interest because he apparently inadvertently admitted into evidence at the new trial hearing the evidence that is the subject of the discrepancy. The parties briefed that issue, but Gray also filed a renewed motion for judicial notice and a brief indicating he will not file a petition for writ of habeas corpus until his appeal is resolved.

2

Thus, we again conclude Gray's defense counsel was ineffective and the prosecutor committed one instance of misconduct but Gray was not prejudiced. We affirm the judgment.

FACTS[1]

On June 30, 2006, Jennifer Gardner, her boyfriend Darnell Little, Maxine Solomon, and Christopher Lang went to a nightclub in Gardner's 1997 Honda Passport. Earlier in the evening, Gardner took one-half of an "Ecstasy" pill and she drank throughout the night. As Solomon and Lang waited outside, Darrel Gray and Randle Hester approached Gardner and Little as they exited the club and one of the men called Gardner a "'bitch.'" Little approached the men. In a face to face confrontation, Little said, "'20's Crip,'" Gray replied, "'East Coast,'" and they both referred to each other as "cuz." The parties left the club separately, Little and his friends in Gardner's vehicle, and Hester and Gray in a grayish blue Dodge Magnum.

Little drove to a nearby gas station and everyone got out. The same Dodge Magnum pulled into the gas station, and Gray and Hester got out. Little and Gray argued again. Gardner and Solomon got back into the vehicle. Little got in the vehicle and said, "Let's go."

Little drove onto the Interstate 5 freeway northbound. Minutes later, Gardner heard "muffled sounds," like gunshots, and Little swerved the vehicle into the center divider. The vehicle came to a stop in the fast lane facing southbound, facing oncoming traffic, with the driver's side of the vehicle on the busy side of the freeway. Little asked if everyone was okay, but Solomon did not respond. Little got out of the vehicle. As Little stood on the freeway, Gardner told him that Solomon was okay. When

---

[1]　　　　We decided Gray's co-defendant's appeal in *People v. Hester* (G041657, Nov. 30, 2010).

3

Little started to say something, either Lang or Solomon asked where Little was. Gardner looked to where Little was standing, but he was gone.

A truck driver traveling northbound on the freeway saw a vehicle in the middle of the freeway. The driver had no time to avoid hitting Little who was standing next to the vehicle. Gardner and the others got out of the vehicle and saw Little lying on the ground about 50 feet up the freeway. Gardner ran to him and realized he was dead.

Officer Daniel Ackerman interviewed Gardner at the scene of the incident.[2] What Gardner told Ackerman was largely the same as we detail above. She stated the altercation at the nightclub "was [a] little tiff" that "was no . . . big deal." She said the men were showing off. She stated Gray said, "East Coast," but she did not know what that was, maybe "a gang out here." She described the argument between Little and Gray at the gas station. Gardner said she was not wearing her eyeglasses and could not see if it was the men in the Dodge Magnum shooting at them but she was "going off [her] gut instinct." Gardner said that after her vehicle came to a stop on the freeway, Little came around to her on the "busy side" of the freeway.

Detective Ryan Dieringer investigated the case.[3] Dieringer obtained a copy of a videotape from surveillance cameras at the nightclub, and he distributed copies to gang officers in Los Angeles County to obtain help in identifying the suspects. Detective Ronald Kingi called Dieringer and eventually identified one of the suspects in

---

[2]     An audio recording of the interview was played for the jury and a transcript of the interview was admitted into evidence and is part of the record on appeal.

[3]     Dieringer and three other officers interviewed Gardner later the same day at Gardner's home. This interview was not admitted into evidence at trial, but the trial court did consider it at the evidentiary hearing on the new trial motion. We will discuss it below.

the videotape as Darrell Gray based on his facial features and distinctive walk.[4]  In the first photographic lineup, Gardner identified someone but she was not certain; the lineup included a photograph of Manuel Gray (Manuel), Gray's brother.  In the second photograph lineup, Gardner identified Gray, although she was unable to identify Hester in another photographic lineup.

Nine shell casings of the same caliber and manufacturer were recovered from Gardner's vehicle and the freeway.  All the bullets were fired into the right side of Gardner's vehicle.

Officers executed a search warrant at Gray's house where they found Gray and Gregory Shively.  Officers discovered items that established Gray lived there and indicia of gang membership.  In the rear bedroom, officers found various items with "East Coast Crips" written on them and in the same bedroom, a letter signed by Gray.  Officers later arrested Hester in a bluish gray Dodge Magnum, which belonged to his girlfriend.[5]

In July 2006, a felony complaint charged Gray with conspiracy to commit murder (Pen. Code, § 182, subd. (a)(1), count 1),[6] four counts of premeditated and deliberate attempted murder (§§ 664, subd. (a), 187, subd. (a), counts 2, 3, 4, & 5), and street terrorism, East Coast Crips (§ 186.22, subd. (a), count 6).  As to all but count 6, the complaint alleged Gray committed the crimes for the benefit of a criminal street gang, East Coast Crips (§ 186.22, subd. (b)(1)).  As to counts 1, 2, 3, 4, and 5, the complaint

---

[4]    He initially identified the men as Manuel Gray and Charles Von Lewis but soon thereafter realized he told Dieringer the wrong name; it should have been Darrell Gray.

[5]    As we explain below in greater detail, Officers interviewed Gray, and Gray identified Hester.

[6]    All further statutory references are to the Penal Code.

5

also alleged Gray was a gang member who *vicariously* discharged a firearm causing great bodily injury (§ 12022.53, subds. (d) & (e)(1)).  Finally, the complaint alleged Gray inflicted great bodily injury (§ 12022.7, subd. (a)), as to counts 1 to 4.

In August 2006, a first amended felony complaint added Hester as a named defendant in counts 1 to 6.  The first amended felony complaint alleged the same enhancements against Gray.  It added the following allegation against Hester—that he was a gang member who *vicariously* discharged a firearm (§ 12022.53, subds. (c) & (e)(1)).

In November 2006, a second amended felony complaint charged Gray and Hester with first degree murder of Little (§ 187, subd. (a), count 1), shooting at an occupied motor vehicle (§ 246, count 2), conspiracy to commit murder (§ 182, subd. (a)(1), count 3), four counts of premeditated and deliberate attempted murder (§§ 664, subd. (a), 187, subd. (a), counts 4 (Little), 5 (Gardner), 6 (Lang), and 7 (Solomon)), and street terrorism (§ 186.22, subd. (a), count 8-Gray (East Coast Crips) & count 9-Hester ("Osage Legend Crips")).  As to count 1, the second amended felony complaint alleged Gray and Hester committed murder during a drive-by shooting (§ 190.2, subd. (a)(21)), and to further the activities of a criminal street gang, East Coast Crips and Osage Legend Crips (§ 190.2, subd. (a)(22)).  As to all but counts 8 and 9, the second amended felony complaint alleged Gray and Hester committed the crimes for the benefit of their respective criminal street gangs.  (§ 186.22, subd. (b)(1)).  As to counts 1, 2, 3, 4, 5, 6, and 7, the second amended felony complaint also alleged Gray was a gang member who *vicariously* discharged a firearm causing great bodily injury (§ 12022.53, subds. (d) & (e)(1)).  With respect to counts 2, 3, and 4, the second amended felony complaint also alleged Hester *personally* inflicted great bodily injury (§ 12022.7, subd. (a)).  Finally, the second amended felony complaint alleged Hester *personally* discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)), as to counts 1 to 7.

6

In December 2006, Gerard Lionel Garcia-Barron, a private attorney appeared and substituted in as counsel for Gray and relieved the Alternate Defender, Raymond Chen.

The preliminary hearing was held in March 2007. A detective testified Lang told him the driver's side window was partially rolled down and "the driver of the vehicle put a dark-colored handgun out of the vehicle and began firing." The trial court held Gray and Hester to answer on all charges and allegations.

In March 2007, an information charged Gray and Hester with the same offenses along with the special circumstances and street terrorism allegations in the second amended felony complaint. The information however alleged Gray and Hester were gang members who *vicariously* discharged a firearm causing great bodily injury (§ 12022.53, subds. (d) & (e)(1)), as to counts 1 to 7. With respect to counts 1, 2, 3, and 4, the information also alleged Hester *personally* inflicted great bodily injury (§ 12022.7, subd. (a)). Finally, the information alleged Hester *personally* discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)), as to counts 1 to 4.

In September 2008, the operative charging document, a first amended information charged Gray and Hester with first degree murder of Little (§ 187, subd. (a), count 1), shooting at an occupied motor vehicle (§ 246, count 2), conspiracy to commit murder (§ 182, subd. (a)(1), count 3), four counts of premeditated and deliberate attempted murder (§§ 664, subd. (a), 187, subd. (a), counts 4 (Little), 5 (Gardner), 6 (Lang), and 7 (Solomon)), and street terrorism (§ 186.22, subd. (a), count 8-Gray (East Coast Crips) & count 9-Hester (Osage Legend Crips)). As to count 1, the amended information alleged Gray and Hester committed murder during a drive-by shooting (§ 190.2, subd. (a)(21)), and to further the activities of a criminal street gang, East Coast Crips and Osage Legend Crips (§ 190.2, subd. (a)(22)). As to all but counts 8 and 9, the amended information alleged Gray and Hester committed the crimes for the benefit of a criminal street gang, East Coast Crips and Osage Legend Crips. (§ 186.22, subd. (b)(1)).

7

As to counts 1, 2, and 4, the amended information alleged Gray was a gang member who *vicariously* discharged a firearm causing great bodily injury (§ 12022.53, subds. (d) & (e)(1)), and with respect to counts 5, 6, and 7, he was a gang member who *vicariously* discharged a firearm (§ 12022.53, subds. (c) & (e)(1)). With respect to counts 1, 2, 3, and 4, the amended information also alleged Hester *personally* inflicted great bodily injury (§ 12022.7, subd. (a)). Finally, as to counts 1, 2, and 4, the amended information alleged Hester *personally* discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)), and with respect to counts 5, 6, and 7, he *personally* discharged a firearm (§ 12022.53, subd. (c)).

Before trial, Hester filed a motion to sever/bifurcate gang charges and allegations from the other counts. Gray joined in the motion. The trial court denied the motion.

At trial in the fall of 2008, the prosecutor offered Gardner's testimony, which is the basis of much of the facts described above. Gardner stated she was reluctant to testify and was scared. Gardner testified the altercation at the nightclub was "heated but calm. You know, nose-to-nose type of conversation." She said the Dodge Magnum drove next to them at the gas station, the same two men got out of the car, and Little and Gray got into a "heated argument." She stated that when Little drove onto the freeway, she put on her eyeglasses. She saw the blue Dodge Magnum pull alongside her vehicle just before the shooting started. She explained that when her vehicle stopped on the freeway, Little got out and "came around to [her] side[]" of the vehicle before he was hit. Gardner said she was "98 to 99 percent sure" of her identification of Gray, and she identified Gray from surveillance video from the nightclub.

On cross-examination, Hester's defense counsel questioned Gardner extensively about whether she was intoxicated, whether she was wearing her eyeglasses, whether she saw the vehicle the shots came from, and her identification of the men. Gardner insisted that although she told Ackerman she did not have her eyeglasses on

8

when she got into her vehicle, she generally puts them on when she gets into her vehicle and she did see the Dodge Magnum. She admitted she lied to police about taking drugs that night.

On cross-examination, Gray's defense counsel began by stating he would try not to repeat what Hester's defense counsel covered but some questions may overlap. He questioned Gardner about whether she was intoxicated, whether she was wearing her eyeglasses in the nightclub, the incidents at the nightclub and the gas station, her description of the men, the shooting, and what happened after the shooting, including her field sobriety tests and her interviews.

Gardner admitted there was no physical violence at the nightclub. Gardner repeated she heard Gray say "East Coast," but when counsel asked if she heard anything else, she replied, "There [was] a lot of 'Crip' going back and forth, but I don't know if it was [Little] or [Gray]. I just know there was a lot of gang stuff going back and forth on [Little's] part." A little later she responded, "Yes," when counsel asked whether Little was yelling, "20 Crip." Gardner testified she did not confront Gray and Hester at the gas station.

Finally, there was some confusion about where Gardner was sitting in the vehicle while they were on the freeway and the exact circumstances of Little's death. Photographs of Gardner's vehicle that were admitted into evidence show the vehicle stopped in the fast lane facing oncoming traffic. There is no dispute Little drove onto the freeway, and Lang sat in the front passenger seat. Gardner repeatedly testified she sat behind Lang in the rear passenger seat. Gardner also testified Little came around to her side of the vehicle to check on Solomon when he was hit by the truck. Gardner testified she never told officers she sat behind Little. But she did state that when the vehicle came to a rest, she recalled being on the "busy side" of the freeway and not the center divider side of the freeway. But she added, "Those are not details I was paying attention to when somebody's killed." When Hester's defense counsel pointed out that if she was sitting in

9

the rear passenger seat and the vehicle was facing oncoming traffic, she would be on the center divider side of the freeway, Gardner responded, "It suggests that. But again, I don't remember those details."

The prosecutor also offered the testimony of Detective Joe Pirooz, a gang expert. After detailing his background, training, and experience, Pirooz testified the Rollin 20's and East Coast were not rivals but they had committed crimes against each other. Pirooz explained the 20's Crips called East Coast derogatory names, such as "Toasters" or "Cheetos." He stated Little was a member of the criminal street gang, "Rollin' 20's Crips" and he had a tattoo of the number "'20'" on his back and the word "'Long Beach'" over his shoulder. He stated Lang was a member of Insane Crips criminal street gang. Additionally, a mural with Little's name, and the phrase "Fucc Toasts" was admitted into evidence. Pirooz asserted this evidence was significant because it demonstrated a rivalry between the two gangs. He opined members of different Crip factions could associate with each other as long as there is not an ongoing rivalry.

Detective Eric Rose testified as the prosecutor's gang expert against Gray. After detailing his background, training, and experience, Rose testified concerning the culture and habits of criminal street gangs, including East Coast. Rose explained the importance of respect and "putting in work" to gain respect in the gang. He stated a gang member loses respect by not participating in "missions." He said a "hit-up" is when one gang member asks another person what gang he is from to determine if the person is a rival or an ally. Rose stated the person doing the "hit-up" is assuming an altercation will result. He testified that if two members of different gangs were in the same car, then one would expect backup from the other, especially if they are partying together. He said gang members talk about their crimes with other gang members to gain respect.

Rose also testified about the importance of guns in gangs. Rose stated that if one gang member is armed with a gun generally the other gang members will know the

10

gang member is armed for purposes of protection. Rose opined that if there are six gang members, one of whom is armed, and there is an altercation, the other gang members would know which gang member is armed for protection. Rose opined this was true even if the gang members are from different gangs.

Rose stated he had testified as an expert on East Coast 15 to 20 times. Rose explained East Coast began in the late 1960s, its name derives from being on the east side of the 110 freeway, and its common symbol is anything related to the New York Yankees. He said there are subsets of East Coast and there are over 1,000 total members. He stated one subset is the "Six Deuce East Coast Crips" (Six Deuce). He opined that at the time of the offenses, East Coast was a criminal street gang.

Rose testified he was familiar with Gray because he had been to his home and had six to 10 prior contacts with him, including instances where Gray was with other known East Coast gang members, most notably Shively. Rose said he reviewed a police report that alleged Gray told another jail inmate he was a Crip. Based on his review of the police reports in this case, his prior contacts with Gray, items recovered from Gray's home, and Gray's tattoos, Rose opined Gray was an active participant in East Coast at the time of the offenses. When the prosecutor asked Rose whether the exchange of gang names in this case influenced his opinion "[Gray's] an active participant[]" Rose stated: "Sure. What he's basically talking about, in case you guys aren't aware, there was an altercation between . . . Gray and another individual from a separate gang in which they're both uttering their gang name back and forth. I believe there's many different times where they go back and forth. Him saying 'East Coast.' The other individual, I believe, something to the effect 'Rollin 20's,' or something to that effect. [¶] You wouldn't utter a name of a street gang unless you belong to that particular street gang. There's -- especially a street gang as large as East Coast Crips. There's a lot of different repercussions that could lead to assault all the way up to murder, for claiming a certain

11

gang that you're not actually a part of." Rose stated "Crip" gang members refer to each other as "Cuz."

Based on a hypothetical question mirroring the facts of this case, Rose testified the crimes were committed for the benefit of the criminal street gang, East Coast, because people will know which gang did the shooting and this would benefit the gang by increasing its reputation for committing violence. He also said it promotes the criminal street gang because if there was not already a rivalry between the two gangs, there would be one as a result of the shooting, and this would promote both gangs. It also benefits the gang by creating a rivalry or war between the two gangs. By putting "Fucc Toasts" on a mural outside Little's house, Rose stated these individuals all know who did the shooting and that will increase respect for the shooter and the gangs.

On cross-examination, Hester's defense counsel questioned Rose about Six Deuce tattoos and territory. On cross-examination, Gray's defense counsel questioned Rose about his background and training, gang culture, and his prior contacts with Gray. Defense counsel established Gray's brother, Manuel, shared a bedroom with Gray and that Rose had seen Manuel with known East Coast gang members, including Shively.

Officer Daniel Milchovich also testified as a gang expert. After detailing his background, training, and experience, Milchovich testified regarding the culture and habits of criminal street gangs, including Osage Legend. Based on Hester's admissions and tattoos, Milchovich's opined Hester was an active member of Osage Legend on the night of the shooting. Based on a hypothetical question mirroring the facts of this case, Milchovich opined the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang, specifically Osage Legend and East Coast. Milchovich stated an Osage Legend gang member associated with an East Coast gang member to commit a crime. He explained commission of the crime would benefit the street gangs because in gang culture the failure to resolve a conflict demonstrates

12

weakness, and showing weakness leads to being disrespected in the gang, which is fatal. When the prosecutor asked Milchovich whether the offenses benefitted Osage Legend when the Osage Legend gang member was not involved in the verbal confrontation, he responded, "Absolutely." He opined, "Again, it's the whole notion of backup, of respect. That gang member being there, that Osage Legends gang member being there with an East Coast Crip, is going to bolster their chances of gaining more respect. That [Osage] Legends Crip gang member is going to act as backup for that East Coast Crip gang member in your hypothetical. [¶] Therefore, if, if he doesn't -- if he doesn't participate, if he doesn't get involved in it, that brings upon that disrespect, that weakness." Milchovich opined the offenses would bring respect to the gang member and the gang because the East Coast gang member committed the crime while the Osage Legend gang member provided backup. The parties stipulated East Coast and Osage Legends were criminal street gangs as statutorily defined.

Finally, the jury heard testimony Gardner's blood alcohol level was .13 at 6:00 a.m. There was also testimony that it was possible a person with a .13 blood alcohol level at 6:00 a.m. would have a .21 blood alcohol level at 2:00 a.m.

Gray rested on the state of the evidence. Before the trial court instructed the jury, on the prosecutor's motion, the trial court dismissed the following enhancements against Hester: he *personally* inflicted great bodily injury (§ 12022.7, subd. (a)), as to counts 1, 2, 3, and 4; he *personally* discharged a firearm causing great bodily injury and death (§ 12022.53, subd. (d)), with respect to counts 1, 2, 3, and 4; and he *personally* discharged a firearm (§ 12022.53, subd. (c)), as to counts 5, 6, and 7.

During closing argument, as relevant here, the prosecutor stated: "Remember, I told you during voir dire, hey, you have someone who wants to commit a bank robbery, he needs other participants. He needs someone to drive him there. The person who drives him there and drops him off and waits for him to commit the robbery is guilty of robbery. They have aided and abetted that robber in committing the crime;

13

right? [¶] Someone who loans them the car, doesn't even drive them there, just says 'use my car,' could commit that robbery. Guilty of robbery. That's how the law works. Doesn't matter who did what in this case. Someone shot, someone drove, both guilty. Aiding and abetting, actual perpetrator of the crime. So, as you go through all this, remember that. [¶] Don't get overly concerned with the roles, because you know someone drove and you know someone shot. And, you know these two were working in connection with each other, whoever it was. Doesn't matter for any of these counts or enhancements which role someone played. [¶] So, as we go through this, each count, I'm just going to say they're both guilty. I'm not going to go through each time why someone was an aider and abettor and someone was the actual perpetrator. It doesn't matter what their role was. This case is not about who was there that night, and not whether the crimes are committed. It's only about who was there, not whether the crimes were committed. And you're going to see that as we go through this. [¶] Role, defendant Gray started the incident, called out his gang name, continued argument, and is the likely shooter; right? That seems like the reasonable inference you can draw from all this. [¶] Hester, he's the backup there, likely the driver. He's the one who owns this car. Doesn't matter, but that's probably the likely scenario. [¶] You're going to see as we go through all these elements, everything flows from count 1. Once you decode that count, all the other counts will follow easily. [¶] . . . [¶] All right. . . . Aiding and abetting. I told you two theories of liability. Aiding and abetting, one, the perpetrator committed the crime. Someone committed the crime, right? The defendant, the aider and abettor, knew the perpetrator intended to commit the crime. Defendant intended to aid and abet the perpetrator. I have the intent to actually help you and defendant's words, or conduct did, in fact, aid and abet the perpetrator."

Hester's defense counsel argued the issue in this case was one of identity as no one identified Hester at the nightclub, at the gas station, or in the vehicle. When it was Gray's defense counsel's turn, he characterized the case as a "'whodunit.'" Defense

14

counsel asked whether the prosecutor had proven beyond a reasonable doubt Gray was at the nightclub, at the gas station, or in the vehicle. He argued the quality of the video surveillance was poor and Gardner's identification was untrustworthy. He repeatedly claimed there was no evidence Gray was at the nightclub or the gas station, or in the Dodge Magnum.

In rebuttal, the prosecutor stated: "And, there's no explanation why he has amongst those letters, amongst those letters in his bedroom, East Coast gang writing. Six Deuce gang writing in those same letters in his bedroom. [¶] . . . [¶] What [Garcia-Barron] never told you, what the explanation was for [Gray] saying that he was a Crip, in jail, after the crime. Kind of significant, that after the crime, in jail, he's telling people in jail that he's a Crip. No explanation for that."

During deliberations, the jury requested Gardner's and Rose's testimony be read back. On October 10, 2008, with the exception of count 4, the jury convicted Gray of all counts and found true all enhancements.

Less than two weeks later, Gray submitted a handwritten note requesting a new attorney. On January 23, 2009, the trial court relieved trial attorney, Garcia-Barron, as counsel of record and replaced him with Michael Clough, the same attorney who was later appointed to represent him in this appeal. Upon Gray's motion, the trial court ordered Garcia-Barron to transfer the file to Clough, which he eventually did.

In July 2009, the prosecutor sent Clough a letter stating Gardner received payments for moving expenses and incidentals from the California Witness Relocation and Protection Program. The letter explained Gardner received one payment before trial in the amount of $3,875 and one payment after trial in the amount of $2,625 for a total of $6,500.

Gray filed a motion to compel discovery, which the prosecutor initially opposed. The parties ultimately agreed on the discovery request.

15

Gray filed a motion for discovery of Rose's confidential police officer records pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). The prosecutor opposed that motion, and Gray replied. The City of Los Angeles agreed to turn over the requested records and after an in camera review, the trial court ordered defense counsel be provided with names and contact information of people who had filed complaints against Rose.

In February 2010, Gray filed a motion for new trial on three grounds: (1) insufficient evidence supports the conclusion Gray was the shooter and his convictions on counts 1 to 7; (2) prosecutorial misconduct because the prosecutor failed to disclose relocation payments to Gardner; and (3) ineffective assistance of counsel based on numerous grounds, including counsel failed to investigate and present a meritorious defense; counsel failed to move to sever his trial from Hester's; counsel failed to object to Gardner's direct testimony and effectively cross-examine her; counsel failed to challenge Rose's qualifications, object to his prejudicial testimony, and present a sociologist to testify concerning the unreliability of gang expert testimony; and counsel failed to object to the prosecutor's misconduct during closing argument when he misstated the law, offered a factual theory he knew to be false, and failed to correct false testimony. The prosecutor opposed the motion. In opposition, the prosecutor conceded he should have disclosed to defense counsel the district attorney's office gave Gardner witness relocation payments but argued the materiality of the evidence was low and its impeachment value weak. Gray replied.

In September 2010, the trial court ruled Gray made a sufficient threshold showing warranting an evidentiary hearing on his ineffective assistance of counsel contentions; Gray's other claims would be addressed later. A briefing schedule on the scope of the evidentiary hearing was set, as were hearing dates.

16

Gray and the prosecutor filed supplemental briefs regarding the scope of the evidentiary hearing. A hearing was held concerning the scope of the evidentiary hearing. The trial court conducted an evidentiary hearing in December 2010.[7]

Garcia-Barron testified at the hearing and a banker's box containing his case file was present in the courtroom. He testified the box contained his entire file but it did not contain any case notes or the preliminary hearing transcript. He did not specifically recall taking any notes other than during voir dire. He explained he does not personally interview witnesses. Instead, he usually hires an investigator to interview witnesses, but he did not hire an investigator in this case. He claimed to have used the witness statements from the discovery, but Garcia-Barron admitted he did not review all the discovery. Before the preliminary hearing, he did not "do any independent interviewing of witnesses or any independent investigation." When questioned about 11 of the CD envelopes, six of the CD envelopes were still sealed closed. He did not show Gray the surveillance videos before trial. He did not make any discovery requests from the prosecutor for additional video surveillance tape. And Garcia-Barron admitted he did not pick up at least two items of discovery from the district attorney's office.

Garcia-Barron did not remember much about the case or his preparation for the case. He did not file any motions. Although he remembered Gray's defense was identification, he did not remember what steps he took to defend against the charges and he did not recall whether Gray told him he was the man in the video surveillance from the nightclub. He knew that in a recorded interview Gray admitted to officers he was at the nightclub, but he thought the video surveillance was of poor quality. He did nothing to follow up though. He did not present an affirmative defense because he did not feel the

---

[7]      By this time, the California State Bar had placed Garcia-Barron on inactive status. On January 29, 2011, Garcia-Barron was disbarred for 42 separate violations occurring from January 2007 to about September 2009. Trial in this case occurred in the Fall of 2008.

17

prosecutor met its evidentiary burden. Garcia-Barron never heard or saw any evidence Gray was the shooter. On cross-examination, Garcia-Barron testified repeatedly that Gray declined to testify against Hester because he feared physical retaliation.

Jack Earley, a criminal defense specialist, testified on the standards of competent defense counsel. Earley explained he reviewed the transcript of the proceedings in the case and the relevant documents and evidence. He explained defense counsel would need to review the discovery, talk with the client, hire an investigator, interview witnesses, and because there was a co-defendant, meet and confer with co-counsel. Earley testified identification was not the only issue in the case. He explained the major issue in the case was who was the shooter and who was the aider and abettor and this raised "major intent issues." Earley opined that any reasonably competent defense counsel would object to expert opinion testimony based on a police report where a defendant admitted his gang membership. Earley stated that depending on the circumstances, defense counsel should have objected to the prosecutor's last minute change of theory regarding who was the shooter. He also opined that based on the evidence he reviewed, a reasonably competent defense counsel may decide to argue his co-defendant was the shooter. He opined an identification defense was not a viable defense for Gray in this case.

Chen, from the Alternate Defender's office, testified that before Garcia-Barron substituted in for him, he reviewed the police reports, witness statements, and surveillance videos. He did not believe identification was a viable defense based on his preliminary review. Chen stated he discussed a possible plea agreement with Gray, but Gray was "very concerned" about testifying against Hester because he feared "physical retribution."

Gray testified he told Garcia-Barron that he was afraid to testify but Garcia-Barron never discussed with him the potential effect of testifying or his potential defenses. Gray stated he told Garcia-Barron that he was at the nightclub. Gray said

18

Garcia-Barron never discussed a defense theory with him, his post-incident statements, trial strategy, or possible witnesses. Gray testified he read Lang's statement and thought his testimony would be beneficial but without any explanation, Garcia-Barron told Gray that he would not call Lang to testify. On cross-examination, Gray said that while they were at the gas station, Gardner threw her shoe at Hester's car, and Hester told Gardner to "'Get the fuck away from my car.'" Gray admitted that during the trial he never told Garcia-Barron he wanted to present a different defense and he never told the trial judge he wanted to testify. Gray added there were "consequences" when you testify against "known gang members." On redirect examination, Gray testified that when they were on the freeway, the other car's driver was driving "in a road-rage-type manner" and Hester retrieved a gun, rolled down the window, and fired the gun out of the car while Gray sat silently.

The trial court admitted into evidence declarations supporting Gray's assertion he was not an active participant of East Coast at the time of the offenses. The court also admitted into evidence declarations from Shively and a friend's mother indicating Shively was not a member or associate of East Coast.

The court also admitted into evidence interviews with Gardner, Lang, Solomon, and Gray.

Dieringer and three other detectives interviewed Gardner after Ackerman interviewed her. Gardner said they were leaving the nightclub when two guys initially tried to talk to her and then "started yelling out, . . . [fuck you] guys East Coast." Gardner stated Little said "something like those are our girls, stop." She said Little said, "cuz," and the men replied, "East Coast." Gardner claimed Little did not make any gang challenges "this time," but she did say "Cuz means you're a Crip." Gardner stated they went to the gas station, parked, and got out when the same men in the same car drove next to them and rolled down their windows. Gardner said Little told them to get back into the vehicle and she did not "recall them saying anything[]" and "[she] didn't hear the

19

guys saying anything" because Little told her to get into the vehicle. She did not claim the men got out of the car or said anything to them. Gardner explained they drove onto the freeway and "out of nowhere" the same car was next to them and they were shooting at them. Gardner admitted she did not have her glasses on but she is nearsighted. When Gardner again stated Little said, "cuz," an officer stated that is because "he's affiliated." Gardner replied, "Yeah." Gardner did not think there were any other gang challenges, but she was walking away.

During his interview, Lang told the officer that he and Solomon went outside to wait because Little and Gardner wanted to dance to one more song. Lang said that when he went back inside, Little was arguing with someone because he disrespected Gardner. Lang stated he did not know the entire story of what happened. Lang did not see their faces. When asked if he heard any gang challenges, Lang replied, "I didn't know nothing about it." Lang told the officer, "The driver's side rolled down his window[]" and "[t]hen they start[ed] shooting." Later, he stated, "And then the driver just let down his window just a little, so, he [could] stick the gun out like halfway and start shooting." He said, "Before I could even tell everybody I see him just . . . stick a gun out the window" and he fired the gun. He insisted the gun was sticking out of the driver's side window. With regard to the seating arrangements in the car, Lang told the officer Little drove to the gas station and then onto the freeway. Lang said he was in the passenger seat, Solomon sat behind him in the rear passenger seat, and Gardner sat behind Little in the rear driver's side seat. Lang initially claimed Little got out of the vehicle to make sure everyone was okay and the truck hit him. Later, he stated when the vehicle came to a stop, Little and Gardner switched spots and when Gardner could not start the car, Little got out of the rear driver's side seat and the truck hit him.

In Solomon's first interview, she told the officer that Lang was in the front passenger seat, she sat behind Lang in the rear passenger side seat, and Gardner was in the rear driver's side seat. She gave a slightly different version of what happened after

20

the vehicle came to a stop on the freeway. She said everyone got out and Gardner got into the front seat and Little sat behind her in the rear driver's side seat. She stated that when Gardner could not start the car, Little got out of the vehicle and the truck hit him. In Solomon's second interview, she said Gardner drove to the gas station but Little drove from the gas station onto the freeway. She explained that when the vehicle came to a stop on the freeway, Little and Gardner switched places and when Gardner could not start the vehicle, Little got out and the truck hit him. The officer characterized Solomon's version of the story as "completely different" from Gardner's. In both interviews, Solomon said she was sitting in the vehicle while Lang walked back into the nightclub to get Little and Gardner.

During his interview, Gray initially denied being at the nightclub but eventually admitted he was there and he was a passenger in the vehicle. Gray said he fired "a couple[]" shots but later said the driver was the shooter and he did not touch the gun. Gray eventually told officers that Hester was the driver.[8]

The trial court denied Gray's request to call Rose as a witness. After the parties rested, a briefing schedule was set. Gray and the prosecutor filed post-evidentiary hearing briefs.

In June 2011, the trial court issued its tentative decision. At the hearing on the motion for a new trial, the trial court indicated it read and considered the substantial briefing, and the court heard counsel's argument. The trial court denied Gray's new trial motion, issuing an exhaustive 57-page final order that superseded the court's tentative decision.

---

[8]     Defense counsel at the new trial hearing offered into evidence the transcript of Gray's interview with the Buena Park Police Department. If a compact disc (CD) or audio recording of an interview is available, the CD or the tape is the best evidence of the interview, not the transcript of the CD or tape. (Evid. Code, §§ 1520-1523.)

21

After a detailed discussion of the evidence, the trial court concluded sufficient evidence supported each of Gray's convictions and the related enhancements. The court discussed each offense and detailed the evidence that supported each count and the enhancements. The court stated: "[S]ufficient, credible evidence supports a reasonable conclusion Gray and his crime partner pursued the victims onto a freeway where Gray intentionally fired multiple gun shots from close range at a moving vehicle driven by Little to resolve an earlier gang related verbal altercation between the two men. Gray's actions ultimately led to Little's death. The evidence supports the jury's verdict finding Gray guilty of first degree murder." The court characterized "[t]he prosecution's case against Gray [as] strong."

With respect to the alleged prosecutorial misconduct, the trial court explained that it was not until after trial that Gray learned Gardner received relocation payments ($3,875 before her testimony and $2,625 after her testimony), and that her testimony was significantly different than her prior statements. The court concluded that although the prosecution should have disclosed the payments before trial (as the prosecutor conceded), Gray was not prejudiced because "there is no reasonable probability the outcome of the trial would have been different had the information . . . been timely disclosed to the defense before trial." The court then cited to all the evidence supporting Gray's convictions.

As to the other alleged instances of prosecutorial misconduct, the court explained the prosecutor did not have a duty to correct his own witness's testimony when it was explored at length on cross-examination and readily apparent to the jury. The court also stated the prosecutor did not misstate the law when he argued it did not matter what role each defendant played in committing the offenses. The court opined the prosecutor's argument properly summarized the law and asked the jury to convict Gray based on reasonable inferences derived from the evidence. The court concluded that in any event, Gray was not prejudiced because the evidence against him was "strong" and

22

the court again detailed the evidence. Finally, the court stated the prosecutor did not commit misconduct in presenting a theory not supported by the evidence. The court noted the evidence at trial was inclusive as to who drove the car and as to who fired the gun. The court reasoned there was substantial circumstantial evidence from which the jury could reasonably conclude Gray was the shooter. The court concluded the prosecutor's charging decision did not establish he changed his theory of the case in bad faith.

Finally, the trial court addressed what was the subject of the evidentiary hearing, Gray's assertion Garcia-Barron provided ineffective, prejudicial representation, which the court characterized as "a close call." The court stated Garcia-Barron did not hire an investigator, did not review all the discovery, did not interview any witnesses, produced little work product, and could not recall what steps he took to defend Gray. The court said Garcia-Barron did not file any motions and made few objections during trial. The court explained that although Garcia-Barron's lack of pretrial preparation was disturbing, the court could not presume Gray was prejudiced (see *U.S. v. Cronic* (1984) 466 U.S. 648, 658), because at the time of trial Garcia-Barron was an active attorney who gave opening and closing statements, cross-examined witnesses, and actively participated in Gray's defense. The court then addressed each of Gray's claims.

First, Garcia-Barron's pretrial preparation was deficient and his decision to proceed with an identification defense was unreasonable because both Gardner's and Kingi's identification of Gray were strong. The court concluded, however, Gray was not prejudiced because he was not deprived of a potentially meritorious defense. The court reasoned there were too many pitfalls associated with offering a defense that Hester was the shooter and Gray the unwitting bystander.

Second, the court explained that based on Garcia-Barron's deficient pretrial preparation, it could not conclude his decision not to move for severance was a reasonable tactical decision based on adequate investigation. The court concluded,

23

however, Gray was not prejudiced because the court would have denied the motion, and even if the court would have granted the motion, Gray's credibility would have been damaged by his prior inconsistent statements.

Third, the court concluded Gray did not establish Garcia-Barron's failure to object to leading questions was deficient, and in any event, Gray was not prejudiced because the prosecutor would have been able to obtain the same testimony from nonleading questions. The court noted that Gardner was cross-examined extensively about her alcohol and drug consumption, whether she was wearing her prescription eyeglasses, where she was sitting in the vehicle, her identification of the defendants and the vehicle, and the confrontation at the nightclub.

Fourth, the court noted Garcia-Barron did cross-examine Gardner on some of the topics Gray complains about. The court opined Garcia-Barron's cross-examination of Gardner could have been more thorough but it tracked Hester's defense counsel's cross-examination of Gardner on many of the relevant issues and Garcia-Barron's decision to limit his cross-examination was reasonable. The court added any testimony by Gardner about other witnesses' testimony would have been inadmissible. The court added, however, that based on Garcia-Barron's deficient pretrial preparation, his decision not to cross-examine Gardner on her prior statements and not to call Lang or Solomon to testify was unreasonable, but Gray was not prejudiced. The court opined the discrepancies in Gardner's testimony were minor, and Lang's and Solomon's testimony would not have materially contradicted Gardner's testimony. Further, the court said Lang's testimony could have been damaging to Gray because it would have corroborated Gardner's testimony the gunshots came from a Dodge Magnum.

Finally, the court concluded Garcia-Barron was not deficient for failing to object to Rose's qualifications as a gang expert. After repeating his background, training, and experience, the court noted Earley testified Rose was qualified to testify as a gang expert. The court stated, however, that based on Garcia-Barron's deficient pretrial

24

preparation, it could not be said his failure to challenge the factual basis for Rose's opinion was a reasonable tactical decision based on adequate investigation. The court opined it was not reasonably probable Gray would have received a more favorable result because the evidence he offered would not have clearly established he was not an East Coast gang member. The court concluded Garcia-Barron was not deficient for failing to object to various items of hearsay evidence upon which Rose based his decision Gray was an active participant in East Coast because expert witnesses are entitled to base their opinion on hearsay.

The trial court sentenced Gray to life in prison without the possibility of parole and a consecutive term of 25 years to life on the vicarious use of a firearm enhancement on count 1. The court imposed concurrent sentences or stayed the sentences on the other counts. Gray appealed.

We affirmed Gray's convictions in *Gray I, supra,* G045645. Gray filed a petition for rehearing and a motion to augment the record. In the rehearing petition, Gray argued, among other things, the transcript of his interview with police that attorney Michael William Clough offered into evidence at the hearing on the new trial motion conflicts with the compact disc (the CD) of the same interview. This is important because in the transcript Gray admitted he fired a couple shots, but Gray claims the CD shows there is no evidence Gray made this crucial admission; rather the CD reflects Hester fired a couple shots. Gray moved to augment the record with the CD. The Attorney General filed an answer opposing both the rehearing petition and the augmentation motion.

We granted rehearing, denied the motion to augment the record, and stayed the appeal. In the same order, we invited Gray to file a petition for writ of habeas corpus addressing the issue of whether he was entitled to re-litigate his new trial motion because of the alleged discrepancy between the transcript of his interview and the CD of his interview.

25

Gray filed a request for judicial notice, asking we take judicial notice of the CD. We denied Gray's request for judicial notice. Gray submitted an application for habeas corpus investigator fees.

We filed an order reserving a ruling on Gray's application for investigator fees. Instead, we ordered the parties to file supplemental letter briefs on the issue of whether attorney Clough has a disqualifying conflict of interest because he apparently inadvertently offered into evidence the inculpatory statement he now claims was transcribed incorrectly.

Gray filed the following: (1) a supplemental letter brief addressing the conflict issue; (2) a supplemental letter brief indicating he does not intend to file a petition for writ of habeas corpus until we decide the appeal and withdrawing his request for habeas corpus investigation fees; and (3) a renewed request for judicial notice. Clough argues he does not have a disqualifying conflict of interest. The Attorney General contends Clough does not have a legal conflict but he does have an ethical conflict.

## DISCUSSION

### I. Ineffective Assistance of Counsel

Ineffective assistance of counsel is not listed as a statutory ground for a new trial. Nonetheless, the California Supreme Court has held that a defendant may seek a new trial on this ground. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582-583; *People v. Taylor* (1984) 162 Cal.App.3d 720, 724 (*Taylor*).)

A statutory motion for a new trial is addressed to the sound discretion of the trial court, and its ruling will not be disturbed unless a clear abuse of discretion is established. A different analysis is required when a nonstatutory motion for a new trial premised on the denial of constitutional rights is made. This requires the application of a two-step process. (*Taylor, supra,* 162 Cal.App.3d at p. 724.)

26

In the first step, the trial court finds the relevant facts. "On appeal, all presumptions favor the trial court's exercise of its power to judge the credibility of witnesses, resolve any conflicts in testimony, weigh the evidence, and draw factual inferences. The trial court's factual findings, express or implied, will be upheld if they are supported by substantial evidence." (*Taylor, supra,* 162 Cal.App.3d at p. 724.)

In the second step, the trial court must decide based upon the facts it has found whether defendant was deprived of his right to the effective assistance of counsel—i.e., whether counsel's performance was deficient and whether the defendant was prejudiced as a result. (*Taylor, supra,* 162 Cal.App.3d at pp. 724-725.) "To the extent that these are questions of law, the appellate court is not bound by the substantial evidence rule, but has '"the ultimate responsibility . . . to measure the facts, as found by the trier, against the constitutional standard . . . ." [Citation.] On that issue, in short, the appellate court exercises its independent judgment.' [Citations.]" (*Id.* at p. 725.)

In order to establish ineffective assistance of counsel, a defendant has the burden to establish his counsel's performance was deficient under an objective standard of reasonableness and that it is reasonably probable that a result more favorable to defendant would have occurred in the absence of counsel's failing. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-698 (*Strickland*); *People v. Bolin* (1998) 18 Cal.4th 297, 333.) To determine prejudice, "we must compare the evidence that actually was presented to the jury with that which could have been presented had counsel acted appropriately. [Citation.]" (*Karis v. Calderon* (9th Cir. 2002) 283 F.3d 1117, 1133.) If an ineffective assistance of counsel claim can be decided on the ground of lack of prejudice, the reviewing court need not determine whether counsel's performance was deficient. (*Strickland, supra,* 466 U.S. at p. 697; *In re Crew* (2011) 52 Cal.4th 126, 150.)

Generally, Gray's central claim is Garcia-Barron presented an implausible defense based on mistaken identification when a viable defense existed based on evidence Hester was the shooter and Gray merely an innocent passenger unaware of

27

Hester's violent plan. Gray's contentions can be grouped into three general categories: Garcia-Barron pretrial preparation; his questioning of Gardner; and his questioning of Rose. With respect to the first category, Gray makes several contentions that essentially all stem from Garcia-Barron's failure to investigate the case, interview witnesses, conduct legal research, request additional discovery, or review *all* the discovery. Needless to say, Garcia-Barron's pretrial preparation was grossly inadequate. His client faced a special circumstance murder charge and life in prison without the possibility of parole. Garcia-Barron testified he does not personally interview witnesses, he hires an investigator to do that, but in this case, he did not hire an investigator. He admitted he did not review all the discovery, did not pick up additional discovery that was left for him at the district attorney's office, or request additional discovery, including any additional video surveillance footage from the nightclub that *may have* been informative as to the nature of the altercation. His case file reflected a dearth of work product. And during his testimony, he repeatedly said he could not remember what he did to defend Gray. Garcia-Barron's admissions demonstrate he provided grossly ineffective pretrial preparation.

Garcia-Barron's deficient pretrial preparation compels the conclusion his failure to file a severance motion was deficient. Garcia-Barron's admissions he did not interview witnesses, review all the discovery, or conduct legal research militate against the conclusion his decision to not file a severance motion was the result of a reasoned analysis of the law and facts of the case. Although the trial court stated it would have likely denied such a motion, Garcia-Barron's complete lack of pretrial preparation requires this court to conclude his failure to file a motion to sever Gray's trial from Hester's was ineffective.

Garcia-Barron's deficient pretrial preparation also compels the conclusion his identity defense was deficient. His failure to investigate the case, interview witnesses, or review discovery prevented Garcia-Barron from making an informed tactical decision

28

that an identity defense was the best option. Quite simply, how can an attorney make such a strategic decision without knowing two witnesses would testify his client was at the nightclub? Therefore, we conclude Garcia-Barron was ineffective in offering an identification defense without having first investigated the case.

Finally, as noted above, Gray claims Garcia-Barron's failure to investigate the case prevented him from offering a potentially meritorious defense—Hester was the shooter, and Gray did not know Hester planned to fire the gun and did not intend to aid and abet Hester in committing the offenses. We agree a defense focused on the shooter's identity and whether Gray harbored an intent to kill was preferable to a defense based on mistaken identification.

As to the second category, Gray argues Garcia-Barron was ineffective because he did not thoroughly cross-examine Gardner about her inconsistent statements, and the inconsistencies between her testimony and Lang's and Solomon's statements. He argues Gardner's testimony conflicted with her statements to police about whether the altercation at the nightclub was gang related and what transpired at the gas station. He also argues Lang's and Solomon's statements contradicted Gardner's statements about the initial confrontation and where Gardner was sitting in the vehicle.

We begin by noting Garcia-Barron cross-examined Gardner about whether she was intoxicated, whether she was wearing her eyeglasses, her identification of the men, the nature of the altercations at the nightclub and the gas station, the shooting, and what happened after the shooting, including her field sobriety tests and her interviews. Garcia-Barron began his cross-examination by informing Gardner he would try not to cover the same material Hester's defense counsel covered. Hester's defense counsel cross-examined Gardner extensively about whether she was intoxicated, whether she was wearing her eyeglasses, whether she saw the vehicle the shots came from, and her identification of the men. He also cross-examined Gardner about where she was sitting in the vehicle and noted she could not have been seated on the "busy side" of the freeway

29

based on the location of the vehicle. Thus, Garcia-Barron acted competently in establishing Gardner's level of intoxication may have affected her ability to perceive events as they unfolded.

However, this does not negate the fact Garcia-Barron did not interview witnesses, review all the discovery, or conduct legal research. Based on his ineffective pretrial preparation, we conclude his failure to cross-examine Gardner concerning her prior inconsistent statements was ineffective. But the inconsistencies Gray cites to were introduced into evidence and the trial court instructed the jury on how to evaluate prior statements. (CALCRIM No. 318.) Gardner testified the altercation at the nightclub was heated, but the jury also heard her first interview where she described the same encounter as "no big deal" and it did not become violent. During her first interview, Gardner never mentioned Little claimed a gang or issued a gang challenge; she described the incident as merely male braggadocio. But the jury heard Gardner's testimony Little said "'20 Crip'" and "a lot of gang stuff." Lastly, Gardner's inconsistent statements concerning the argument between Little and Gray at the gas station were minimal and inconsequential.

With respect to his second claim, Garcia-Barron was ineffective for failing to call Lang and Solomon to testify as to the nature of the altercation outside the nightclub and where Gardner was sitting in the vehicle. However, Solomon told an officer she was sitting in the vehicle and did not witness the altercation. And Lang also admitted he was outside and the altercation had already begun when he returned. Lang told the officer he could not recall the nature of the altercation. Additionally, the seating arrangements really were a tangential issue, a point Gray concedes later in his brief. We recognize Garner's recollection of where she was sitting in the vehicle could impact the jury's determination of her credibility, but Gardner admitted she was not focused on where she was seated based on the fact she was being shot at and her boyfriend was hit by a truck and killed. Hester's defense counsel on cross-examination pointed out Gardner could not be on the "busy side" of the freeway if she was sitting in the back

30

passenger seat based on where the vehicle was situated on the freeway. Before he began cross-examination, Garcia-Barron stated he would try to avoid covering the same ground as Hester's defense counsel. Gardner also testified she may have been mistaken about some of the things she told the police. Thus, the inconsistencies were covered and to some extent explained without cross-examination by Garcia-Barron.

With respect to the third category, Gray contends Garcia-Barron was deficient in his cross-examination of Rose based on the following: (1) Garcia-Barron did not object to highly prejudicial expert gang testimony concerning gang guns or whether Gray was an active participant in East Coast; (2) Garcia-Barron's failure to investigate and review all the discovery resulted in him not obtaining evidence Gray was not an East Coast gang member, he was not the author of the gang writings found in his bedroom, and the jail record Rose relied on did not include Gray's admission he was a Crip; and (3) Garcia-Barron's failure to investigate resulted in him not filing a *Pitchess* motion to discover Rose's alleged unethical conduct in an unrelated case where he shot a fleeing suspect and lied to internal affairs to escape culpability.

We begin by noting there is sufficient evidence in the record Rose was qualified to testify as a gang expert. Although he had been assigned to the gang unit for less than a year, he had been a police officer for over eight years and had dealt with East Coast for four years. He had testified as a gang expert on East Coast 15 to 20 times. Finally, Gray's expert, Earley, testified Rose was a seasoned officer who was qualified to testify as an expert on gangs.

With respect to Gray's first claim, it is well settled expert testimony about gang culture and habits is admissible and the type of evidence a jury may rely on to reach a verdict on gang charges, and the expert may rely on hearsay in forming his opinion. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 948 (*Gonzalez*); *People v. Gardeley* (1996) 14 Cal.4th 605, 616, 620-621 (*Gardeley*).) Rose testified that if there is a group of gang members and one has a gun, the other gang members will know. Rose opined this holds

31

true even if not all are from the same gang.  And Pirooz testified different Crip factions will associate with each other if there is not an ongoing rivalry.  Thus, there was a sufficient basis for Rose's opinion, and any objection would have been overruled.

Additionally, Garcia-Barron was not deficient for failing to object to the prosecutor's inquiry of Rose concerning his opinion whether the nature of the altercation influenced Rose's opinion concerning Gray's gang status.  During this exchange, Rose did not express an opinion whether Gray was guilty of the charged offense or the enhancements.  (*People v. Vang* (2011) 52 Cal.4th 1038, 1048 [witness may not express opinion on defendant's guilt but may offer otherwise admissible opinion even if it embraces ultimate issue to be decided by jury].)  Rose merely testified it was his opinion Gray was an active participant at the time of the offenses based in part on Gray's claim he was an East Coast gang member.

Gray's second contention is that Garcia-Barron's complete lack of pretrial preparation compels the conclusion he was ineffective in investigating Gray's gang background.  Although Garcia-Barron did establish during cross-examination that Gray's brother also lived in the room and he associated with East Coast gang members, Garcia-Barron did not interview two witnesses who would have supported Gray's assertion he was not an East Coast gang member.  Further, Garcia-Barron's failure to review the discovery prevented him from learning the exhibit Rose relied on, Exhibit No. B2, does not include Gray's self-admission he was an East Coast gang member.  The jail record states the victim of the attack believed his attackers were Crips.  Thus, Garcia-Barron's lack of pretrial preparation prevented him from moving to exclude this statement as unreliable hearsay or effectively cross-examining Rose on the basis of his opinion Gray was an active participant in East Coast.

With respect to his last claim, Gray's appellate counsel filed a *Pitchess* motion, and the trial court conducted an evidentiary hearing and ordered the disclosure of names and contact information of persons who had filed complaints against Rose.  Based

32

on this information, Gray contends Rose testified falsely in a Los Angeles probation revocation hearing. But the trial court did not agree, finding no evidence of dishonesty. Gray does not contend the trial court erred in finding the *Pitchess* information was inadmissible. Consequently, no prejudice has been shown by Garcia-Barron's failure to raise the issue at trial.

*Prejudice*

We must now determine whether Gray was prejudiced by Garcia-Barron's utterly deficient performance. As we explain above more fully, we have concluded Garcia-Barron provided ineffective assistance of counsel in the following respects: (1) his complete lack of pretrial preparation compels the conclusion his failure to file a motion to sever his trial from Hester's trial, his failure to investigate Gray's gang background, and his offering of an identification defense could not have been the result of reasonable tactical decisions based on adequate investigation; (2) he failed to cross-examine Gardner regarding her prior inconsistent statements; and (3) he failed to call Lang and Solomon to testify to contradict Gardner's testimony. We must now determine whether Gray was prejudiced by Garcia-Barron's significant lapses in representation. Although this is an extremely close case, we conclude Gray was not prejudiced because there was sufficient evidence supporting his convictions and Gray has not established there is a *reasonable probability* the result of the proceeding would have been different had Garcia-Barron not provided deficient counsel.

The evidence at trial established this was a dispute concerning a woman that quickly turned into a deadly gang confrontation. Gardner's identification from a photographic lineup, and Kingi's identification from surveillance video, placed Gray at the nightclub.

With respect to the gang evidence, the parties stipulated East Coast and Osage Legends were criminal street gangs. There was strong evidence he was an active participant of East Coast at the time of the offenses. The gang expert testified that Gray

33

had gang indicia in his home, had gang tattoos, and was contacted by law enforcement in the company of other known gang members.  And as we explain anon, there was evidence Gray openly claimed he was a member of East Coast.  There was evidence the victim, Little, was a member of "Rollin' 20's Crips," and although they were not rivals with East Coast, members of those two gangs had previously committed crimes against each other.  Finally, there was testimony a gang member would know when another gang member is armed even when the gang members are not members of the same gang.

As to the circumstances of the offenses, the evidence demonstrated Gardner, Little, Solomon, and Lang went to a nightclub in Gardner's vehicle.  As Gardner and Little left the nightclub, Gardner testified a man at the nightclub made a derogatory remark to her.  Although Gray contends the surveillance video does not confirm this, there is no real dispute something inflamed Little, and he got into a verbal confrontation with a man who was later identified as Gray.  Even Lang, the witness who Gray now asserts would have provided exculpatory testimony had he testified at trial, told police Little got into a verbal altercation with a man.  Garner's testimony established that what started as Little defending his girlfriend's honor evolved into a gang confrontation. Gardner stated that Little claimed he was a member of Rollin' 20's Crips, and Gray replied he was a member of East Coast.  Both Little and Gray also referred to each other as "cuz," which the evidence established was how Crip gang members refer to each other. Evidence Gray openly claimed gang membership at the nightclub undermines Gray's assertion the jury would have questioned Rose's credibility and discounted his opinion Gray was an active participant in East Coast had Garcia-Barron presented the information he claims would have shown he did not belong to a gang.

Once that skirmish ended, Gardner, Little, Solomon, and Lang got into Gardner's vehicle and drove to a nearby filling station.  The evidence at trial demonstrated Hester and Gray followed the foursome to the gas station in a blue or gray Dodge Magnum, a vehicle that matched the description of a vehicle Hester was later

34

driving when officers arrested him. Although Gray again questions Gardner's account of what transpired at the gas station, there was testimony Gray and Little argued again before Little and his three friends got back into Gardner's vehicle and drove onto the freeway. Gardner testified that when they were on the freeway, she saw the same Dodge Magnum drive next to them before the shooting began. From this evidence, the jury could certainly conclude that Gray and Hester conspired to follow Gardner's vehicle onto the freeway and shoot at Gardner's vehicle. Moreover, the jury could also reasonably conclude that because Gray had argued with Little first at the nightclub, and then again at the gas station, he was the one who fired the gun to resolve the gang dispute and enhance his and his gang's reputation.

Thus, there was evidence from which the jury could reasonably conclude Gray, an admitted East Coast gang member, and his confederate, Hester, an Osage Legend gang member, agreed to and acted together in retaliating against Little and his friends by pursuing them onto the freeway and shooting at them, ultimately causing Little's death, to benefit and promote their gangs.

Gray contends a viable defense existed based on evidence Hester was the shooter and Gray did not aid and abet the shooting. Comparing the evidence the prosecution presented at trial to the evidence Gray offered at the new trial hearing, however, leads us to conclude he has failed to meet his burden to show a reasonable probability the outcome of the proceeding would have been different.

Gray overstates the significance of Lang's pretrial statements to a detective who testified at the preliminary hearing that "Lang told me that the driver of the vehicle put a dark-colored handgun out of the vehicle and began firing." True, this supports the theory Hester was the shooter, coupled with information the car belonged to Hester, although it does not categorically prove this point. More importantly, it sheds no light on whether Gray aided and abetted the shooting. Based on the gang experts' testimony, Gardner's testimony, and other prosecution evidence, it appears to us the only way for

35

Gray to raise a reasonable doubt on the issue was to credibly testify he lacked the requisite mental state.

The record *before us* shows this would have been impossible. The transcript of Gray's pretrial interview shows he admitted firing "a couple" of shots.[9]

---

[9] We recognize there is a possibility of a significant discrepancy between the transcript of Gray's interview with the Buena Park Police Department that defense counsel offered into evidence at the new trial hearing and the CD of the same interview. After we filed our opinion in *Gray I, supra,* G045645, Gray made numerous attempts to make the CD part of the record.

As to whether augmentation is proper, "'[O]ur review on direct appeal is limited to the appellate record.' [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 952.) California Rules of Court, rule 8.155(a)(1)(A), authorizes an appellate court to augment the record with "[a]ny document filed or lodged in the case in superior court . . . ." (6 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Appeal, § 164, p. 446 [matters outside record not generally reviewable].)

At the hearing on the new trial motion, Gray's defense counsel offered into evidence a transcript of Gray's interview with the police that included an inculpatory statement—Gray's admission he fired a couple shots. Gray's counsel did not offer into evidence the CD of the same interview that allegedly included an exculpatory statement—Gray's accusation Hester fired a couple shots. To now augment the record with the CD would result in supplementing the record with something that was not before the trial court when it ruled on the new trial motion. That is improper as we are limited to reviewing the record before the trial court.

With respect to whether judicial notice is appropriate, Evidence Code section 452, subdivision (h), authorizes a court to take judicial notice of "Facts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy." The comment to subdivision (h), states: "Subdivision (h) provides for judicial notice of indisputable facts immediately ascertainable by reference to sources of reasonably indisputable accuracy. . . . Sources of reasonably indisputable accuracy include not only treatises, encyclopedias, almanacs, and the like, but also persons learned in the subject matter." "Strictly speaking, a court takes judicial notice of facts, not documents. [Citation.]" (*Fontenot v. Wells Fargo Bank, N.A.* (2011) 198 Cal.App.4th 256, 265.)

Here, Gray cites to no authority, and we found none, that authorizes this court to take judicial notice of a CD as it is generally facts, not documents, that are the proper subject of judicial notice. Additionally, Gray's request we take judicial notice of "the fact of what actual words were used in that interview," in our view is not a proper subject of Evidence Code section 452, subdivision (h), as that subdivision envisions courts taking judicial notice of "treatises, encyclopedias, almanacs, and the like, [and]

36

Thus, it is not reasonably probable a jury would have believed Gray's denials if he testified.

Even if the transcript did not contain this damaging admission, Gray still could not prevail. Gray admitted he told Chen, his conflict lawyer, and Garcia-Barron that he would not testify because he feared reprisals for naming Hester as the shooter. We recognize Garcia-Barron neither informed Gray of potential defenses nor discussed the evidence with him, presumably, as we have noted, because Garcia-Barron did not adequately investigate the case. But Gray was not asked whether he would testify had a competent attorney explained his options. Absent evidence Gray would have changed his mind about testifying, he cannot show a reasonable probability of a more favorable result.

In conclusion, the record includes sufficient evidence supporting Gray's convictions. Additionally, Gray offers no compelling strategy that would have likely resulted in a more favorable outcome for him. Therefore, Gray has not established there is a reasonable probability he would have received a more favorable result had Garcia-Barron not provided ineffective assistance of counsel because his alternative defense was weak.

---

also persons learned in the subject matter." Thus, we deny Gray's renewed motion to take judicial notice of the CD and the "actual words" used during the interview.

Gray suggests that if there is a good faith dispute as to the authenticity of the CD, this court should litigate the reliability of the CD. This would require the appellate court to perform a function not contemplated by the law, and one better suited for the trial court. We decline Gray's invitation to augment the record with or take judicial notice of evidence that "seems reliable" as it would be replete with dangers. The evidence has not been the subject of a trial court hearing where the crucible of foundational requirements would apply.

Gray's best remedy is to file a petition for writ of habeas corpus in the trial court alleging the discrepancy entitles him to relitigate his new trial motion. (*People v. Gray* (2005) 37 Cal.4th 168, 211.)

37

*Failure to Object to Prosecutorial Misconduct*

Gray claims Garcia-Barron was ineffective because he did not object to the numerous instances of alleged prosecutorial misconduct detailed below. As we will explain, the prosecutor committed one instance of misconduct, but Garcia-Barron could not have objected to it because it did not come to light until after trial. Thus, Garcia-Barron was not ineffective for failing to object to the alleged prosecutorial misconduct we discuss below.

*Cumulative Effect of Ineffective Assistance of Counsel Error*

Gray argues the cumulative effect of the numerous defense errors requires reversal. We have concluded there were numerous instances of defense error. However, based on the evidence of Gray's guilt we detail above, we conclude those errors did not prejudice Gray. To reverse a judgment based on ineffective assistance of counsel, it is appellant's burden to demonstrate a reasonable probability that absent defense counsel's deficiencies, he would have received a more favorable result. Based on this record, Gray has not satisfied this high bar, and when viewed in its entirety, we cannot conclude the total effect of the error was prejudicial.

*II. Prosecutorial Misconduct*

"""""A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citation.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"' [Citation.]" (*People v. Ayala* (2000) 23 Cal.4th 225, 283-284.)

The Attorney General argues Gray forfeited appellate review of all the claims of alleged prosecutorial misconduct because he did not object and request a curative admonition. (*People v. Foster* (2010) 50 Cal.4th 1301, 1354.) Gray argues any

objection would have been futile, but he does not explain why. Because Gray contends Garcia-Barron was ineffective for failing to object to the alleged misconduct, we will address the merits of his claim. (See *People v. Williams* (1998) 61 Cal.App.4th 649, 657 [addressing the merits of a claim, despite its forfeiture, because defendant asserted ineffective assistance of counsel].) Before we do that though, we will first address the one instance Garcia-Barron could not have objected to because the prosecutor did not disclose the misconduct until after trial was complete—the prosecutor's witness relocation payments to Gardner.

*A. Failure to Disclose Prosecution Witness Payment*

Gray asserts the prosecutor committed misconduct because he did not disclose he made witness relocation payments to Gardner. We agree but conclude Gray was not prejudiced.

In *Brady v. Maryland* (1963) 373 U.S. 83, 87, the Supreme Court of the United States held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

"'[T]he term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "*Brady* material"—although, strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict. There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' [Citation.] Prejudice, in this context, focuses on 'the materiality of the evidence to the issue of guilt or innocence.' [Citations.] Materiality, in turn, requires more than a showing that the suppressed evidence would have been admissible [citation],

39

that the absence of the suppressed evidence made conviction 'more likely' [citation], or that using the suppressed evidence to discredit a witness's testimony 'might have changed the outcome of the trial' [citation]. A defendant instead 'must show a "reasonable probability of a different result."' [Citation.]" (*People v. Salazar* (2005) 35 Cal.4th 1031, 1042-1043.) We review Gray's claim de novo.

The Attorney General concedes the prosecutor should have disclosed to Gray before trial that Gardner received witness relocation payments. But the Attorney General argues Gray has not demonstrated there was a reasonable probability of a different result had the prosecutor disclosed the evidence before trial. We agree with the Attorney General.

When viewed in the light most favorable to Gray, had the prosecutor disclosed the witness relocation payments to Gray before trial, his defense counsel could have attacked Gardner's credibility in the following respects: that Gardner was reluctant to testify and she received payments in exchange for her testimony; and that based on her inconsistent statements to Ackerman, she slanted her testimony in favor of the prosecution. But Gray admits the disclosure of the payments was "unlikely to have caused jurors to change their assessment of all parts of her testimony." Gray concedes it "would not have caused jurors to doubt her identification of him; nor would it have been likely to cause them to doubt her testimony that the words 'East Coast' were uttered."

That concession is crucial because it places Gray at the nightclub and tends to establish the altercation was gang related. During her interview with Ackerman, her interview with gang detectives, and her testimony, Gardner was consistent in the crucial aspects of the incident. Gardner stated a man tried to talk to her at the nightclub. She said a man she later identified as Gray with "98 to 99 percent" certainty was one of the men at the nightclub. She stated that after they left the nightclub, the same two men followed them to the gas station in a car. Finally, she said the same car was next to her vehicle on the freeway at the time of the shooting.

40

It is true Gardner was inconsistent in her statements in a few respects, including the severity of the incident at the nightclub and whether Little used gang terminology, her initial description of the vehicle, whether she was wearing her eyeglasses, her inability to identify Hester, and her level of intoxication. But as we explain above, Gardner was consistent in the key aspects of her testimony. Thus, there was not a reasonable probability the result of the proceeding would have been different had the prosecutor disclosed to the defense before trial that Gardner received witness relocation payments. We now turn to those instances of alleged prosecutorial misconduct Garcia-Barron could have objected to during trial but failed to do so.

B. *Eliciting False and Misleading Testimony*

Gray contends the prosecutor committed misconduct by "presenting and failing to correct false and misleading testimony by witnesses." Although he acknowledges it is unlikely it would have changed the outcome of the trial, Gray contends the prosecutor committed misconduct when he elicited Gardner's erroneous testimony she was seated in the rear passenger side seat. He also contends the prosecutor committed misconduct when he elicited Rose's false testimony that while in jail, Gray admitted he was an East Coast gang member.

A prosecutor commits misconduct when he or she uses deceptive or reprehensible methods to persuade a jury. (*People v. Rowland* (1992) 4 Cal.4th 238, 274.) A prosecutor may not present evidence that he or she knows to be false and must correct any falsity of which he or she is aware. (*People v. Seaton* (2001) 26 Cal.4th 598, 647.)

With respect to his first claim, Gray points to nothing in the record to support his contention the prosecutor knowingly elicited evidence from Gardner he knew to be false. Indeed, the record contains no evidence the prosecutor deliberately cajoled Gardner into testifying she was seated in the rear passenger side seat. Gardner was thoroughly cross-examined on where she was sitting in the vehicle, and she admitted her

41

memory on the topic was hazy, considering the trauma of the event. (*People v. Ervin* (2000) 22 Cal.4th 48, 92 [prosecutor no duty to correct own witness's testimony where inconsistencies explored at length on cross-examination].) Gray has not established the prosecutor committed misconduct on what was really a subsidiary point.

As to his second claim, an expert may base an opinion on reasonably reliable hearsay (*Gonzalez, supra,* 38 Cal.4th at p. 948; *Gardeley, supra,* 14 Cal.4th at p. 618.) The jail record Rose relied on in forming his opinion Gray was an active participant in East Coast described eyewitness accounts of Gray's leadership role in an attack on an inmate by a group of men believed to be Crip members.

As the Attorney General notes, "[t]he victim identified Gray as the 'rep,' which means 'the person in charge of his particular race' who ordered the attack and then participated in the beating . . . ." The Attorney General also notes "Gray himself 'admitted to being the [B]lack inmate representative . . . ." Rose certainly could rely on this report to support his opinion Gray was an active gang participant, but he overstated the matter when he testified the report "alleged that . . . Gray informed another member inside the jail system that he was a Crip." The report does not record Gray's express admission he was a Crip gang member, although that certainly is a reasonable inference Rose was entitled to draw. Assuming the prosecutor should have corrected Rose's testimony, we conclude there is no reasonable likelihood Rose's testimony could have affected the jury's verdict. (See *People v. Dickey* (2005) 35 Cal.4th 884, 909-910.)

Rose could rely on this evidence, and other evidence discovered during his review of the case, in determining whether Gray was an East Coast gang member. The prosecutor did not commit misconduct.

C. *Change in Theory*

Gray argues the prosecutor committed misconduct when after initially charging Hester with personally discharging a firearm and personally inflicting great bodily injury and death, the prosecutor dismissed those allegations against Hester and

42

proceeded based on the theory Gray was the shooter. In a related claim, Gray argues the prosecutor committed misconduct when during closing argument he argued Gray was the "'likely shooter.'" Neither contention has merit.

Prosecutors have an ethical obligation to search for the truth, convict the guilty, and not convict the innocent. (*U.S. v. Wade* (1967) 388 U.S. 218, 256-258 (conc. & dis. opn. of White, J.).) "A prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence. [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 726.)

Here, we presume that at the close of trial, the prosecutor realized there was insufficient evidence to support the conclusion Hester fired the gun and moved to dismiss those enhancements. On the prosecutor's motion, the trial court dismissed the enhancements against Hester that he *personally* inflicted great bodily injury, *personally* discharged a firearm causing great bodily injury and death, and *personally* discharged a firearm. The prosecutor fulfilled his ethical obligation when, at the end of the trial, he concluded the evidence did not support a true finding on the enhancements.

The evidence at trial did establish Gray was at the nightclub, he got into an altercation with Little, he got into a car that followed Little to a gas station and again argued with Little, and the same car was next to the victims' vehicle when the shooting began. The evidence also established Hester's girlfriend owned a vehicle that matched the description of the car that the gunshots came from. From this evidence the jury could reasonably conclude Hester drove the car, but he was not the shooter, and Gray, who had just exchanged gang challenges with Little, was the shooter. These were reasonable inferences the jury could draw from the evidence, and the prosecutor's arguments did not implicate Gray's federal due process rights because Gray was not charged with personally discharging a firearm or personally inflicting death or great bodily injury. As we explain, below, the prosecutor properly argued there were two defendants who

43

committed the offenses and the jury need not decide who was the driver and who was the shooter. (*People v. Wilson* (2008) 44 Cal.4th 758, 801-802 (*Wilson*) [federal due process does not require jury to find whether defendant direct perpetrator or aider and abettor].)

Gray's reliance on *In re Sakarias* (2005) 35 Cal.4th 140, is misplaced. In that case, the California Supreme Court condemned the use of irreconcilable theories of guilt or culpability in *separate* trials of co-defendants that necessarily risks or causes a false conviction or finding. (*Id.* at pp. 159-160.) Here, Gray and Hester were tried together, and the prosecutor's theories of guilt were not irreconcilable. The prosecutor argued the jury could reasonably infer from the evidence one defendant was the driver and one defendant was the shooter and it did not matter what role each defendant played. Thus, the prosecutor did not commit misconduct when he proceeded on the theory Gray was the "likely shooter."

## D. Misstatement of the Law

Gray claims the prosecutor misstated the law when he argued the jury did not have to agree which role either defendant played. We disagree.

"[T]he jury need not decide unanimously whether a defendant was a direct perpetrator or an aider and abettor, so long as it is unanimous that he was one or the other." (*Wilson, supra,* 44 Cal.4th at pp. 801.) "When two or more persons combine to commit a crime, the jury need not agree on exactly who did what as long as it is convinced a particular defendant committed the crime regardless of what that defendant's precise role may have been. Sometimes there may be uncertainty as to which of two persons did what, but no doubt that each, or at least a particular defendant, was guilty of the crime." (*People v. Russo* (2001) 25 Cal.4th 1124, 1135-1136.)

Here, as we detail above, the prosecutor stated it did not "matter who did what in this case[]" and "[d]on't get overly concerned with the roles, because you know someone drove and you know someone shot." Considering the prosecutor's comments in

44

context, this was a correct statement of the law, and the prosecutor did not commit misconduct.

*E.  Griffin Error*

Gray asserts the prosecutor committed misconduct when he argued Gray did not explain why there were gang writings amongst personal letters in his bedroom and why he did not explain the reason for him claiming he was an East Coast gang member while he was in jail.  Not so.

"'[T]he Fifth Amendment . . . forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt.' (*Griffin v. California* (1965) 380 U.S. 609, 615 . . . .)  The prosecutor's argument cannot refer to the absence of evidence that only the defendant's testimony could provide. [Citation.]  The rule, however, does not extend to comments on the state of the evidence or on the failure of the defense to introduce material evidence or to call logical witnesses. [Citation.]"  (*People v. Brady* (2010) 50 Cal.4th 547, 565-566.)

Here, the prosecutor did not comment on Gray's decision not to testify. The prosecutor merely stated defense counsel did not offer evidence explaining why there was gang indicia in Gray's bedroom.  Counsel could have called Gray's brother, Manuel, to provide that testimony.  And the prosecutor stated defense counsel did not offer any evidence refuting the assertion that while in jail Gray claimed he was a Crip.  Counsel could have offered more evidence from the jail report concerning the basis for Rose's opinion.  Thus, the prosecutor did not commit misconduct by arguing Gray's defense counsel failed to explain the above-mentioned evidence.

*F.  Failure to Conduct Proper Investigation*

Gray claims the police officers investigating the crime skewed their investigation to fit the prosecutor's theory the offenses were gang related and ignored other evidence that did not fit the prosecutor's theory of the case.  To support this specious claim, Gray merely cites to an isolated statement from Lang, contradictions

45

between Gardner's and Solomon's testimony, and the fact officers obtained only a portion of the nightclub's video surveillance. Because Gray does not provide any reasoned argument to support his claim, we need not discuss it further. (Cal. Rules of Court, rule 8.204(a)(1)(B); *People v. Stanley* (1995) 10 Cal.4th 764, 793.)

## G. Discovery Violation

Gray contends the prosecutor "engaged in a pattern of deceptive conduct" by not disclosing Kingi viewed the nightclub surveillance video shortly before testifying and doubted his previous identification of Von Lewis. Gray spills much ink discussing this claim but he states, "The violation concerned testimony that was not directly relevant to the case against Gray" and, "This discovery violation did not directly impact Gray's defense." Because Gray admits this alleged prosecutorial misconduct did not prejudice him, we need not discuss it further. (Cal. Const., art. VI, § 13; *People v. Guerra* (2006) 37 Cal.4th 1067, 1159-1160 [trial court grant new trial motion only if defendant established reversible error], overruled on other grounds in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

## H. Prejudice

We have concluded the prosecutor committed only one instance of misconduct. As discussed above, Gray was not prejudiced by the prosecutor's failure to disclose Gardner received witness relocation payments. Thus, we need not discuss this claim further.

## III. Final Thoughts

Garcia-Barron's deficiencies permeated the trial process. He failed to adequately prepare for trial, and he was grossly inadequate in his trial tactics. His client faced a special circumstance murder charge, and he did not interview any witnesses or review all the discovery. No competent criminal defense attorney can adequately examine witnesses without knowing what the witnesses intend to say or prepare a defense without knowing what evidence the prosecutor intends to rely on. This is one of the more

egregious examples of ineffective assistance of counsel we have witnessed either as trial judges or appellate justices.  This is a close case.  However, based on the overwhelming evidence of Gray's guilt, we cannot conclude there is a reasonable probability the result of the proceeding would have been different absent Garcia-Barron's deficient performance.

DISPOSITION

The judgment is affirmed.  We deny Gray's renewed motion to take judicial notice of the CD.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


ARONSON, J.

47